CLIFFORD BIEDERSTADT AND DOROTHY L. BIEDERSTADT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Biederstadt v. Commissioner
Docket No. 23357-87.
United States Tax Court
T.C. Memo 1989-235; 1989 Tax Ct. Memo LEXIS 235; 57 T.C.M. (CCH) 395; T.C.M. (RIA) 89235; May 15, 1989; As corrected Patrick R. McKenzie, for the petitioners. Catherine M. Brady, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax and additions *236 to tax for the calendar years 1982 and 1983 in the following amounts: Year
Deficiency
Sec. 6653(b)(1) [1]
Sec. 6653(b)(2)
Sec. 6661(a)
1982
$ 1,552.00
$   776.00
* --
1983
$ 9,045.00
$ 4,523.00
*
$ 2,261.25
In the notice of deficiency , respondent determined, in the alternative, additions to tax under section 6653(a)(1) and (2). Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for decision: (1) whether any portion of petitioners' understatement of their 1982 and 1983 tax liabilities was due to fraud; (2) whether assessment of deficiencies and additions to tax for petitioners' 1982 tax year is barred by the statute of limitations; (3) whether, if petitioners' understatement of their 1983 tax liability was not due to fraud, any portion of such understatement was due to negligence or intentional disregard of the rule or regulations; *237 and (4) whether petitioners are liable for the addition to tax under section 6661(a) because they substantially understated their 1983 income tax liability and, if so, whether the percentage rate of such addition is 25 percent or 10 percent. FINDINGS OF FACT Petitioners, Clifford and Dorothy Biederstadt, lived in Mission Viejo, California at the time the petition in this case was filed. During 1982 and 1983, the years at issue, petitioners utilized the cash receipts and disbursements method of accounting and computed their Federal income tax liability on the basis of a calendar year. In August 1981, Mr. Biederstadt began working for Nacom Industries, Inc. (Nacom or the company) as a prototype machinist. Mr. Biederstadt never finished high school. However, he did pass a high school equivalency exam and thus received a Graduation Equivalency Diploma (G.E.D.). In addition, Mr. Biederstadt attended a trade school for four years in order to become a tool and die maker. Mr. Biederstadt underwent open-heart surgery in the late 1970's. Despite his lack of formal education, by 1982, Mr. Biederstadt had been promoted to plant manager at Nacom. In addition, Mr. Biederstadt performed *238 work as an independent contractor for Nacom in 1981 and during the years here at issue. He would manufacture certain specialized parts from blueprints provided by Nacom or by Nacom's customers. Nacom supplied all materials and facilities so that Mr. Biederstadt had very few expenses. However, Mr. Biederstadt subcontracted with other individuals to perform Nacom work and, thus, was required to pay some subcontracting expenses. He paid these subcontracting expenses in cash and retained the invoices which represented these expenses. Mr. Biederstadt issued one invoice for $ 68.00 dated November 20, 1981, to Nacom. Mr. Biederstadt issued four invoices to Nacom in the total amount of $ 3,950 for the parts he manufactured and the services he performed as an independent contractor in 1982. He retained, for his records, copies of the invoices he issued to Nacom in 1982. In 1982, Nacom issued to Mr. Biederstadt four separate checks which totaled $ 3,950 in payment of the invoiced amounts. He immediately cashed these checks. He did not pay any subcontracting expenses in 1982. Mr. Biederstadt issued 39 invoices to Nacom in the total amount of $ 23,654.50 for the parts he manufactured *239 and the services he performed as an independent contractor in 1983. He retained, for his records, copies of the invoices issued to Nacom in 1983. In 1983, Nacom issued to Mr. Biederstadt 31 checks which totaled $ 23,654.50 in payment of the invoiced amounts. Mr. Biederstadt immediately cashed these checks. He paid a total of $ 4,294.72 in subcontracting expenses in 1983. He retained the invoices which represent these subcontracting expenses. During the years at issue, Nacom employed approximately 50 persons. Only three or four of these persons, including Mr. Biederstadt, performed independent contracting services for Nacom. In January 1982, Ms. Dorothy Baker began working for Nacom as a bookkeeper. In her capacity as bookkeeper, Ms. Baker prepared Nacom's financial statements, the company's weekly payroll, and the quarterly payroll tax returns. She also prepared, on a yearly basis, the Forms W-2 issued by Nacom to its employees and the Forms 1099 issued by Nacom to its independent contractors. After preparing the Forms 1099 for the year, Ms. Baker would prepare a Form 1096, Annual Summary and Transmittal of U.S. Information Returns, on which she would report the number *240 of Forms 1099 issued by Nacom in that year. Ms. Baker would also prepare a Form 596, Annual Summary and Transmittal of Information Returns, for the State of California. The Form 596 required much of the same information required by the Form 1096. After preparing and signing the Form 1096, Ms. Baker would give the form to Nacom's president for review. Ms. Baker would then mail the Form 1096. Finally, Ms. Baker would hand-carry the Forms 1099 to the employees who performed independent contracting services. Ms. Baker prepared and signed Nacom's Form 1096 for the 1982 calendar year. The form is dated February 9, 1983 and on or about February 9, 1983, she hand-delivered to Mr. Biederstadt his Form 1099 for the 1982 calendar year. The Form 1099 disclosed that $ 3,950 had been paid to Mr. Biederstadt in his capacity as an independent contractor. Nacom also issued to Mr. Biederstadt a Form W-2 for 1982 showing that he received a total of $ 40,511.78 in compensation from Nacom in his capacity as an employee. Ms. Baker prepared Nacom's Form 1096 for the 1983 calendar year. The form is dated January 27, 1984 and within a week of such date, Ms. Baker hand-delivered to Mr. Biederstadt *241 his Form 1099 for the 1983 calendar year. The Form 1099 reported that $ 23,654.50 had been paid to Mr. Biederstadt in his capacity as an independent contractor. Mr. Biederstadt placed the Form 1099 in his pocket. Nacom also issued to Mr. Biederstadt a Form W-2 for 1983 showing that he received a total of $ 42,680 in compensation from Nacom in his capacity as an employee. In December 1986, Nacom was acquired by Fluorocarbon, Inc. (Fluorocarbon). Mr. Biederstadt left Nacom shortly after the acquisition. In August 1987, Mr. Biederstadt started his own company, Beco Industries, Inc., which competes directly with Fluorocarbon. Mr. Biederstadt did not prepare petitioners' tax returns. He would collect records and documents and give them to Mrs. Biederstadt who would, in turn, take them to the tax preparer or accountant who prepared petitioners' income tax returns. Mr. Biederstadt did prepare a ledger of sorts for the calendar year 1983 in which he recorded invoice numbers, amounts charged to Nacom, and amounts paid to subcontractors. He prepared a similar ledger for 1984. Mr. Lloyd A. Bennett, a tax return preparer, prepared petitioners' 1982 Federal income tax return. Mr. Bennett *242 had not previously prepared petitioners' tax returns. It was Mr. Bennett's practice, when preparing the tax returns of new clients such as petitioners, to solicit certain information from the clients. For example, Mr. Bennett would ask to see the clients' tax return for the previous year. He would then ask to see the clients' Forms W-2 and Forms 1099. Finally, he would ask the clients whether they had any other sources of income. Mrs. Biederstadt brought petitioners' 1982 calendar year records to Mr. Bennett's office. Mr. Biederstadt did not accompany Mrs. Biederstadt to Mr. Bennett's office. On the 1982 return prepared by Mr. Bennett, petitioners reported total wages, salaries, and tips in the amount of $ 44,067 ($ 40,511.78 earned by Mr. Biederstadt plus $ 3,555 earned by Mrs. Biederstadt, rounded off to the nearest dollar). The return also contained miscellaneous entries for commission income, employee business expenses, and charitable contributions. The income from Mr. Biederstadt's contracting services was not reported on petitioners' 1982 tax return and no Schedule C profit and loss statement was filed with the return. Mr. Jorge Ramos, a certified public accountant, *243 prepared petitioners' 1983 Federal income tax return, as well as their returns for 1984 and 1985. It was Mr. Ramos' practice, when preparing a client's tax return, to give the client a worksheet or client interview sheet on which they were requested to disclose financial information relevant to the preparation of their income tax returns. However, some clients complained that the worksheet was too complicated and did not answer the questions on the worksheet. Mr. Ramos would then go through the information (if any) supplied on the worksheet and also solicit further information pertaining to other income or expenses. In 1984, Mrs. Biederstadt brought petitioners' 1983 calendar year records to Mr. Ramos' office. Mr. Biederstadt did not accompany Mrs. Biederstadt even though Mrs. Biederstadt was still recovering from recent back surgery. On the 1983 return prepared by Mr. Ramos, petitioners reported total wages, salaries, and tips in the amount of $ 42,680. The return also contained miscellaneous entries for interest income, state and local income and personal property tax deductions, deductions for tax return preparation fees, and charitable contribution deductions. No income *244 from Mr. Biederstadt's independent contracting services was reported on petitioners' 1983 tax return and no Schedule C profit and loss statement was prepared or filed with the return. Consequently, Mr. Ramos charged petitioners only for the preparation of a long-form return with no Schedule C or self-employment tax computation. A Schedule C profit and loss statement was prepared for both petitioners' 1984 tax return and petitioners' 1985 tax return. These schedules disclose significant gross receipts and expenses attributable to the independent contracting services performed by Mr. Biederstadt in 1984 and 1985. They indicate that the source of the income for 1984 and 1985 is machine parts. Mr. Ramos maintained files for petitioners' 1983, 1984, and 1985 tax years. At the time of trial, his file for petitioner's 1983 tax year contained only the Form W-2 issued to Mr. Biederstadt by Nacom. It did not contain a financial information worksheet, nor did it contain the original or a copy of the Form 1099 issued by Nacom to Mr. Biederstadt. The file also did not contain any records pertaining to interest income, deductions for taxes paid, deductions for tax preparer fees, or charitable *245 contribution deductions. Mr. Ramos often solicited such information from his clients and then returned the records (i.e., the Form 1099) from which the information was derived to the clients. Finally, the file did not contain a ledger prepared by Mr. Biederstadt for 1983 in connection with his independent contracting services. The file for petitioners' 1984 tax return, which was also prepared by Mr. Ramos, contained the Form W-2 issued by Nacom to Mr. Biederstadt for 1984. It also contained a Form 1099 for the amount of $ 42,869.54 issued by Nacom Industries to Mr. Biederstadt for 1984. In addition, the file contained a copy of a Form 1099 issued by Mr. Biederstadt to a subcontractor, some notes containing information relating to petitioners' tax return, and a copy of the ledger prepared by Mr. Biederstadt for 1984 in connection with his independent contracting services. The file for petitioners' 1985 tax return, which was also prepared by Mr. Ramos, contains a client interview sheet and a Form W-2 issued by Nacom to Mr. Biederstadt. It contains a Form 1099 for the amount of $ 29,900.69 issued to Mr. Biederstadt in connection with his independent contracting work, and a Form *246 1099 issued by Mr. Biederstadt to a subcontractor. The file also contains various other work papers and documents. The file does not contain a ledger similar to that prepared by Mr. Biederstadt for 1984. In April 1986, Mr. Chuck Pruzinec, an agent of the Internal Revenue Service (the Service), contacted petitioners regarding the examination of their income tax return for the calendar year 1983. The return had been selected for examination because the Service had received information from Nacom indicating that payments had been made to Mr. Biederstadt, which income had not been reported on petitioners' 1983 return. In this initial contact letter, Agent Pruzinec scheduled an appointment for April 21, 1986 with petitioners and asked petitioners to bring any records pertaining to all payments they received from Nacom in 1983. Both Mr. and Mrs. Biederstadt attended the conference. However, the only document they brought with them was a copy of their 1983 return with the 1983 Form W-2 attached. Agent Pruzinec informed petitioners that the Service had received information from Nacom for petitioners' 1983 tax year. Mr. Biederstadt explained that he manufactured specialized parts *247 at night and on weekends as an independent contractor for Nacom but stated to Agent Pruzinec that he did not begin to perform such work until 1984. Agent Pruzinec suggested that Mr. Biederstadt check his records. On April 30, 1986, Agent Pruzinec spoke with Mr. Biederstadt on the telephone. In that conversation, Mr. Biederstadt told Agent Pruzinec that he had obtained a copy of the 1983 Form 1099 from Nacom and that the Form 1099 had refreshed his memory as to the contracting work he performed in 1983. Mr. Biederstadt indicated his concern over how such a large amount of income could have been omitted from petitioners' return and that he was attempting to obtain an appointment with Mr. Ramos to discuss the matter. Immediately after he finished his conversation with Mr. Biederstadt, Agent Pruzinec drove to Mr. Ramos' office in order to examine petitioners' file for 1983 and interview Mr. Ramos. Mr. Ramos stated that he had not heard from petitioners since the last time he prepared their tax return. Mr. Ramos and Agent Pruzinec then reviewed petitioners' file for the 1983 taxable year. At that time, Mr. Ramos told Agent Pruzinec that he did not believe petitioners had informed *248 him of the existence of any Form 1099 income. Agent Pruzinec also reviewed petitioners' files for the 1984 and 1985 tax years and discovered the Forms 1099 issued by Nacom to Mr. Biederstadt for those years. Agent Pruzinec had a second and final meeting with petitioners on May 22, 1986. Petitioners brought various records pertaining to Mr. Biederstadt's 1983 contracting work, including invoices, receipts for subcontracting expenses, and the ledger of contracting income and expenses which Mr. Biederstadt had prepared for the 1983 tax year. The 1983 ledger was similar to that prepared by Mr. Biederstadt and retained by Mr. Ramos for 1984. Mr. Biederstadt indicated that, after reviewing his records, he had discovered that he had, indeed, started doing contracting work in 1983. He also indicated that, as far as he could tell, the omission must have been Mr. Ramos' fault. Agent Pruzinec then told petitioners about his earlier meeting and conversation with Mr. Ramos. In response, Mr. Biederstadt stated that, because he didn't think Mr. Ramos was lying, he must have forgotten to give the necessary documents to Mr. Ramos. Also during this interview, petitioners revealed that they *249 had previously been audited by the Service for a year not here in issue and that a large deficiency and a great deal of collection activity had resulted. Mr. Biederstadt indicated that he felt bitterness towards the Service because of all the tax problems he had in prior years. On May 30, 1986, subsequent to the second and final meeting with petitioners, Agent Pruzinec visited Nacom and spoke with Ms. Baker regarding Mr. Biederstadt's records. Ms. Baker reviewed Mr. Biederstadt's file with Agent Pruzinec. At that time, the file contained Forms 1099 for petitioners' 1982, 1983, 1984, and 1985 tax years. Ms. Baker stated that she was positive she had given Mr. Biederstadt his 1983 Form 1099. In addition, the file contained the original invoices issued to Nacom by Mr. Biederstadt and copies of the checks issued by Nacom in payment of the invoiced amounts. The file also contained worksheets prepared by Ms. Baker on which she recorded the amount and check number of each check issued to Mr Biederstadt. During this visit, Agent Pruzinec first became aware that Mr. Biederstadt had received contracting income in 1982. Agent Pruzinec subsequently expanded his audit to include petitioners' *250 1982 tax year. On April 13, 1987, respondent issued a notice of deficiency for petitioners' 1982 and 1983 tax years. In his notice of deficiency, respondent increased petitioners' 1982 income by $ 3,950, the amount received by Mr. Biederstadt from Nacom as an independent contractor and omitted from petitioners' 1982 return. The increase in income resulted in a deficiency in income tax of $ 1,552 for petitioners' 1982 tax year. Respondent increased petitioners' 1983 income by $ 22,980, the amount received by Mr. Biederstadt from Nacom as an independent contractor in 1983 less subcontracting expenses. [2] The increase in income resulted in a deficiency in income tax of $ 9,045. *251 Respondent also determined that petitioners' underpayment of their 1982 and 1983 income tax was due to fraud and, therefore, petitioners were liable for additions to tax under section 6653(b)(1) and section 6653(b)(2). Respondent determined, in the alternative, that petitioners' underpayment of their 1982 and 1983 income tax was due to negligence or intentional disregard of the rules and regulations and, therefore, petitioners were liable for additions to tax under section 6653(a)(1) and section 6653(a)(2). Finally, respondent determined that petitioners were liable for the 25-percent addition to tax for substantial understatement of their 1983 income tax liability. OPINION The first issue for decision is whether petitioners' underpayment of their 1982 and 1983 income tax was due to fraud. A finding of fraud with intent to evade tax for petitioners' 1982 tax year will have two consequences. First, respondent will not be barred from assessing a deficiency and additions to tax for petitioners' 1982 tax year by the 3-year period of limitations contained in section 6501(a)[3] and second, petitioners will be liable for additions to tax under section 6653(b)(1) and section 6653(b)(2) *252 for their 1982 tax year. [4] A finding of fraud for petitioners' 1983 tax year will render petitioners liable for additions to tax under section 6653(b)(1) and section 6653(b)(2) for that year. *253 The existence of fraud is a question of fact to be determined from the entire record. Edelson v. Commissioner,829 F.2d 828, 832 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; Recklitis v. Commissioner,91 T.C. 874, 909 (1988). Respondent bears the burden of proving the existence of fraud by clear and convincing evidence. Section 7454(a); Edelson v. Commissioner, supra at 832; Rule 142(b). Thus, in order for his determination of fraud to be sustained, respondent must prove by clear and convincing evidence that petitioners engaged in intentional wrongdoing with the specific intent to avoid a tax known to be owing. Bradford v. Commissioner,796 F.2d 303, 307 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Akland v. Commissioner,767 F.2d 618, 621 (9th Cir. 1985), affg. a Memorandum Opinion of this Court; Recklitis v. Commissioner, supra at 909. Similarly, in order for *254 the unlimited period of assessment provided for in section 6501(c)(1) to apply, respondent must prove by clear and convincing evidence that petitioners filed a fraudulent return with the intent to evade tax. A finding of fraud with an intent to evade tax under section 6653(b) on the part of a taxpayer also results in the period of limitations not barring the assessment and collection of tax in accordance with section 6501(c)(1). Considine v. United States,683 F.2d 1285, 1288 (9th Cir. 1982); Meier v. Commissioner,91 T.C. 273, 303 (1988). Since direct proof of a taxpayer's fraudulent intent is rarely available, fraud may be proven by circumstantial evidence and the reasonable inferences that can be drawn therefrom. Edelson v. Commissioner, supra at 832; Bradford v. Commissioner, supra at 307; Akland v. Commissioner, supra at 621; Meier v. Commissioner, supra at 297. Such circumstantial evidence or indicia of fraud include: (1) understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing *255 assets; and (6) failure to cooperate with tax authorities. Edelson v. Commissioner, supra at 832; Bradford v. Commissioner, supra at 307. The taxpayer's knowledge, or lack thereof, of the income tax laws is also significant. Rutana v. Commissioner,88 T.C. 1329, 1336 (1987). In addition, the taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Recklitis v. Commissioner, supra at 910. However, fraud is never presumed. Kotmair v. Commissioner,86 T.C. 1253, 1260 (1986). According to respondent, petitioners' entire course of conduct evidences the requisite fraudulent intent. Respondent paints the following picture of the events which transpired: Petitioners received Forms W-2 and Forms 1099 from Nacom for their 1982 and 1983 tax years. Mr. Biederstadt, a successful and intelligent businessman, prepared and retained a multitude of invoices evidencing his performance of independent contracting work in 1982 and 1983. During 1983, Mr. Biederstadt maintained a ledger of the contracting income received and subcontracting expenses paid out in that year. *256 Despite the existence of these extensive records, which were within petitioners' possession, petitioners purposefully withheld these records from their tax return preparers and intentionally caused the omission of substantial amounts of contracting income from their 1982 and 1983 returns. To compound this fraudulent omission, petitioners, when contacted by Agent Pruzinec with respect to their 1983 return, denied that they received contracting income in 1983 and did not bring all their records to an initial appointment with Agent Pruzinec. After he was confronted with evidence that he did, indeed, receive contracting income in 1983, Mr. Biederstadt claimed that his memory was suddenly refreshed but that the omission was probably the return preparer's fault. Mr. Biederstadt brought his extensive records to a second meeting with Agent Pruzinec and, after being confronted with the results of the interview conducted by respondent's agent with Mr. Ramos, finally admitted that the substantial omission of income was his fault. However, petitioners paint a very different picture. According to petitioners, Mr. Biederstadt is a man of limited education and intelligence, although he is *257 a hard worker. He does not understand Federal income tax law. His lack of education and intelligence is further aggravated by the memory lapses which plague him. Mr. Biederstadt does not remember receiving his Forms 1099 from Ms. Baker, the bookkeeper at Nacom. In any event, Mr. Biederstadt is not "a man of paperwork" and gave whatever records he received or prepared to his wife who, in turn, gave the records to petitioners' tax return preparers. During the years at issue, Mrs. Biederstadt was recovering from extensive back surgery and suffered from extensive physical problems herself. She was not aware of Mr. Biederstadt's performance of contracting work or assumed it was part of his job as plant manager. Mrs. Biederstadt cannot recall what records she was given by Mr. Biederstadt, although she is sure that she gave all the records she received from Mr. Biederstadt to petitioners' return preparers. If any Forms 1099, which Mr. Biederstadt received from Nacom, were omitted from the materials given to the return preparers, the omission was inadvertent. Mr. Biederstadt did not accompany his wife to the return preparers' offices. Furthermore, petitioners claim that both Mr. *258 Bennett and Mr. Ramos, on whose expertise they extensively relied in the preparation of their 1982 and 1983 tax returns, failed to ask petitioners if they had any sources of income, other than those reflected in the materials petitioners had produced. Thus, Mr. Biederstadt's contracting income was inadvertently omitted from the returns prepared by Mr. Bennett and Mr. Ramos. Petitioners claim they failed to detect the omission because neither reviewed the returns prior to signing and mailing them. When petitioners were contacted by Agent Pruzinec regarding the examination of their 1983 return, Mr. Biederstadt simply did not remember that he had received the contracting income in 1982 and 1983. After contacting Nacom and reviewing his own records, Mr. Biederstadt realized that he had received omitted income in 1983 and, thereafter, cooperated fully with respondent. He provided Agent Pruzinec with all of his records and, according to petitioners, at that time prepared a 1983 ledger coordinating the various invoices and receipts he had retained. Thus, petitioners contend their omissions were not fraudulent nor did they intend to evade a tax they knew that they owed. Although respondent *259 points to other factors, his argument that fraud has been shown relies to a large extent on the fact that petitioners omitted substantial income from their tax returns. Respondent is correct in asserting that a consistent pattern of underreporting income, especially when accompanied by other circumstances showing an intent to conceal, can justify an inference of fraud. Lollis v. Commissioner,595 F.2d 1189, 1191 (5th Cir. 1979), affg. a Memorandum Opinion of this Court (taxpayers omitted over 85 percent of their income in each of four consecutive years; fraud addition sustained); Truesdell v. Commissioner,89 T.C. 1280, 1302 (1987) (taxpayer omitted over $ 110,000 in income over a 3-year period; other indicia of fraud present; fraud addition sustained); Brooks v. Commissioner,82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985) (taxpayer omitted over $ 337,000 in income over a 7-year period, omitting over $ 90,000 in a single year; other indicia of fraud present; fraud addition sustained). However, courts generally will not infer fraud from mere understatements of income unless *260 there has been a pattern of consistent underreporting over several years. Rutana v. Commissioner,88 T.C. 1329, 1336 (1987). See Holland v. United States,348 U.S. 121, 129 (1954). We conclude that, in the instant case, respondent has not demonstrated a consistent pattern of underreporting and omission of income on the part of petitioners. At trial, respondent introduced evidence relating to petitioners' 1981, 1982, 1983, 1984, and 1985 tax years. Respondent produced evidence that petitioners received gross income of $ 68.00 from Nacom in 1981 for Mr. Biederstadt's services as an independent contractor, but did not place into evidence petitioners' 1981 income tax return or any other evidence which would show whether petitioners included the contracting receipts in income. In 1982, petitioners received income from Nacom for Mr. Biederstadt's services as an independent contractor, which petitioners failed to include on their return. However, the amount omitted, $ 3,950, was relatively small in comparison to the amount of income, $ 42,075, which petitioners did report on their 1982 return. Respondent also showed that in 1983, petitioners received *261 income from Nacom for Mr. Biederstadt's services as an independent contractor, which was omitted on their income tax return. The net income omitted, $ 19,359.78, was substantial in relation to the net income petitioners reported, $ 40,313. The record also shows that, in 1984 and 1985, petitioners received a substantial amount of income, $ 42,869.54 and $ 29,900.63, respectively, from Nacom for Mr. Biederstadt's services as an independent contractor. However, petitioners reported all of such income on their tax returns. The evidence clearly shows only an omission of income by petitioners in two out of the five years. The omission in 1982 was less than 9.4 percent of petitioners' total income. After omitting a substantial amount in 1983, petitioners reported even larger amounts in 1984 and 1985. These facts do not show that petitioners' overall conduct amounts to "a pattern of consistent underreporting." However, respondent argues that there are other indicia of fraud which corroborate his theory that petitioners' omissions were fraudulent. Respondent relies, to a great extent, on the fact that, in petitioners' initial meeting with Agent Pruzinec, Mr. Biederstadt stated that *262 he did not start his independent contracting work for Nacom until 1984. It is true that false and misleading statements to respondent's agents are an indicia of fraud. Truesdell v. Commissioner, supra at 1303; Grosshandler v. Commissioner,75 T.C. 1 (1980). However, the evidence here is insufficient to clearly show that petitioner knew his statements were false or misleading at the time he made them. Mr. Biederstadt testified that, at the time of the meeting, he simply did not remember receiving income from Nacom in 1983. He testified that his memory was impaired as a result of his heart problems. When his memory was refreshed through looking at his records, Mr. Biederstadt did not deny receiving the income. The record shows that Mr. Biederstadt informed the agent that he was mistaken in saying he had not received contract income from Nacom in 1983 and told the agent the amount of that income before the agent interviewed his 1983 return preparer. After Mr. Biederstadt determined he had received 1983 income from Nacom as an independent contractor, petitioners cooperated fully with respondent's investigation and supplied respondent with all *263 records Mr. Biederstadt had maintained. Petitioners' 1983 return preparer, Mr. Ramos, had very little in his file with respect to petitioners' 1983 return. The only documents he had in that file were copies of the return and a copy of Mr. Biederstadt's Form W-2. However, the fact that some interest income was reported and itemized deductions claimed, showed that Mr. Ramos used other information when the return was prepared but had not retained copies of the information. Certainly omission of income, particularly in the amount omitted by petitioners in 1983, creates a suspicion of fraud. The facts show that the return preparer had no records from which he prepared petitioners' 1983 return except a copy of a Form W-2. This leaves us to speculate as to other documents he may have had and not kept and the questions he may have asked petitioners before preparing their 1983 return. Petitioners both testified that they did not review the return before signing and mailing it. If true, such inattentiveness to filing a proper return is inexcusable, but does not establish fraud. On the basis of this record, we conclude that respondent has not proved by clear and convincing evidence *264 that any part of petitioners' underpayment of tax for 1982 or 1983 was due to fraud with intent to evade tax. We conclude that petitioners were grossly negligent in omitting Mr. Biederstadt's contract income from their 1983 return. Petitioners clearly received the 1983 Form 1099 from Nacom. If they lost such form before bringing their records to Mr. Ramos, their actions were negligent. If their 1983 records were somehow lost during the transportation to Mr. Ramos' office, this too was negligent. If they successfully transported their records to Mr. Ramos' office and Mr. Ramos simply failed to include the income on their return, they were negligent in not reviewing the return before signing and submitting it. Mr. Biederstadt was negligent when he refused to become involved in the preparation of petitioners' 1983 return. In view of Mr. Biederstadt's claimed complete abdication of his responsibilities, Mrs. Biederstadt was also negligent in not reviewing the return and verifying that all income was reported. We conclude that petitioners' entire underpayment of their 1983 income tax was due to negligence and, therefore, we sustain respondent's alternative determination that petitioners *265 are liable for additions to tax under section 6653(a)(1) and section 6653(a)(2). The final issue for determination is whether petitioners are liable for additions to tax under section 6661(a) for their 1983 tax year and the appropriate percentage rate of such addition. In his notice of deficiency, respondent determined that the section 6661(a) addition was applicable and that the appropriate rate of such addition was 25 percent. Section 6661(a) provides for an addition to tax where there is a substantial understatement of income tax liability unless there is substantial authority for the taxpayer's treatment of the item which caused the understatement or the taxpayer adequately discloses the facts surrounding his treatment of the item which caused the understatement. Section 6661(b)(2)(B). A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the income tax liability which should have been reported or $ 5,000. Section 6661(b)(1)(A). Petitioners have conceded that a substantial understatement of income tax liability exists. Petitioners *266 also concede, in effect, that there was no adequate disclosure on their return of the facts surrounding Mr. Biederstadt's contract income nor was there any authority for the failure to include such amounts in income. However, petitioners claim that respondent erred in utilizing a 25-percent rate when determining the addition to tax under section 6661(a). Petitioners claim that the appropriate rate is 10 percent. We have previously decided in Pallottini v. Commissioner,90 T.C. 498 (1988), that where respondent asserts the higher rate, the appropriate rate of the addition to tax under section 6661(a) is 25 percent. We, therefore, sustain respondent's utilization of the 25-percent rate. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the deficiency. ↩
2. In the notice of deficiency, the sum of $ 26,735 appears beside the caption "1099 Issued by Nacom Industries" for 1983. "Offsetting Expenses, verified" for 1983 is stated to be $ 3,755, resulting in the increase in income of $ 22,980. However, the 1983 Form 1099 entered into evidence jointly in this case, shows a total amount paid to Mr. Biederstadt in 1983 of $ 23,654.50. The parties have also stipulated that petitioners received only $ 23,654.50. The parties have not attempted to explain this discrepancy in the notice of deficiency.↩
3. Section 6501(a) provides that: (a) GENERAL RULE. -- Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. Section 6501(c)(1) provides that: (c) EXCEPTIONS. -- (1) FALSE RETURN. -- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. ↩
4. Section 6653(b) provides: (b) FRAUD. -- (1) IN GENERAL. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. (2) ADDITIONAL AMOUNT FOR PORTION ATTRIBUTABLE TO FRAUD. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to fraud, and (B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).↩